962 F.2d 169
 Paul FINKEL, Paul Magnuson, Glenn Yarnis, and Harvey
Watkins, Individually and as Representatives of
all persons similarly situated,
Plaintiffs-Appellants,
v.
The STRATTON CORPORATION, a Vermont Corporation; Moore &
Munger, Inc., a Delaware Corporation, Stig Albertsson,
Lovick Suddath, David A. Rosow, Sherman T. Van Esselstyn,
Victor C. Braun, Jr., Henry L. Levkoff, Wayne G. Granquist,
Robert H. Kelso, and Dowmar Securities Inc., a New York
Corporation, Defendants-Appellees.
 No. 1057, Docket 91-9252.
 United States Court of Appeals,
Second Circuit.
 Argued March 10, 1992.
Decided April 20, 1992.
 
 Kenneth J. Wilbur, New York City (Shanley & Fisher, P.C., of counsel), for plaintiffs-appellants.
 Jeremy Dworkin, South Londonderry, Vt. (Richard J. Wiener, Cadwalader, Wickersham & Taft, New York City, George Brooks, Montpelier, Vt., Gregory S. Mertz, Burlington, Vt., of counsel), for defendants-appellees.
 Before: OAKES, Chief Judge, ALTIMARI and WALKER, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Plaintiffs Paul Finkel, Paul Magnuson, Glenn Yarnis, and Harvey Watkins appeal from the dismissal of their purported federal securities law class action. Plaintiffs alleged below that the Stratton Corporation ("StratCorp"), along with the individual officers and directors of StratCorp, Moore & Munger, Inc., StratCorp's parent company, and Dowmar Securities, Inc., ("Dowmar"), StratCorp's investment adviser (collectively, "Stratton") made false and misleading statements in connection with the sale of units in "The Stratton Mountain Village Lodge", a development located at the Stratton Mountain ski resort. Plaintiffs brought suit pursuant to §§ 11, 12(2) and 17(a) of the Securities Act of 1933 (" '33 Act"), 15 U.S.C. §§ 77k, 77l (2) and 77q(a); § 10(b) of the Securities Exchange Act of 1934 (" '34 Act"), 15 U.S.C. § 78j(b); the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961 et seq.; and a host of state statutory and common law rules.
 
 
 2
 On defendants' motion, the district court dismissed plaintiffs' claims. The court held that the § 11 and § 12(2) claims were time barred, and that no private right of action exists under § 17(a). The court also concluded that plaintiffs' § 10(b) and RICO claims were inadequate because plaintiffs had not pled fraud with particularity. The district court granted plaintiffs leave to replead the § 10(b) and RICO claims, but plaintiffs failed to do so. Finally, the court declined to exercise pendent jurisdiction over plaintiffs' state law claims. This appeal from the dismissal of the § 11, § 12(2) and § 17(a) claims followed.
 
 Background
 
 3
 Plaintiffs sued on their own behalf and as representatives of the approximately 70 individuals who acquired the 91 condominium units designated as "Phase I" of the Village Lodge. The parties agree that the units, sold subject to a mandatory management agreement under which Stratton contracted to operate the units collectively as lodging accommodations, constitute securities within the meaning of the federal securities laws. See United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852-53, 95 S.Ct. 2051, 2060-61, 44 L.Ed.2d 621 (1975).
 
 
 4
 Stratton filed with the Securities and Exchange Commission (SEC) a registration statement and prospectus, dated June 21, 1984, describing the development in great detail. Stratton planned to build and sell the lodge units in two phases. Phase I consisted of the 91 units at issue here. In Phase II, Stratton planned to offer an additional 83 units. The prospectus represented that these lodge units would form an integral part of an "inter-related resort village" called Stratton Mountain Village, to contain, in addition to the condominium units, a 16-18,000 square foot conference center. The prospectus acknowledged quite clearly that the conference center might never be built:
 
 
 5
 Though future development of facilities at Stratton Mountain is master planned or being planned for municipal approval, such future development is neither financed or approved by the appropriate public authorities, but neither Stratcorp nor any of its affiliates make any representation or commitment as to the construction or availability of any recreational, commercial, or other facilities at Stratton Mountain or Bromley Ski Area beyond those already in place or under construction, and purchase of a condominium security offered hereby should not be made in reliance on any facility not already in place or under construction at Stratton Mountain and Bromley. Registrant has no reason to believe that all necessary consents, permits and approvals will not be received. The foregoing is set forth herein not as a promise of future facilities but rather to inform a prospective investor of Stratcorp's plans and intentions.
 
 
 6
 Lack of Meeting Facilities. The Lodge will have no facilities for meeting or conference business until the Conference Center is built nearby. No assurance can be given that the conference center ever will be built and certainly, at present, financing for such center is not available. (emphasis added).
 
 
 7
 Despite these impressive disclaimers, the plaintiffs contend that they purchased their units in the expectation of reaping profits from customers attracted by the forthcoming conference center.
 
 
 8
 The prospectus also detailed the terms of the offering. Potential purchasers would initially deposit with Dowmar an amount up to 10% of the purchase price. An investor could withdraw that downpayment without penalty at any time until "all 91 units in Phase I have been subscribed." Once Phase I was fully subscribed, Dowmar would request each investor to increase her deposit to a full 10% of the purchase price. Upon depositing the full 10%, the investor lost the ability to withdraw from the offering and became obligated for the remaining 90% of the purchase price. The prospectus provided that if a purchaser attempted to renege after the cancellation rights terminated, Stratton would be entitled to damages equal to "the down payment plus such additional damages that StratCorp can establish in any action or suit."
 
 
 9
 On or about October 24, 1984, Dowmar informed the purchasers that Phase I was fully subscribed. Dowmar also sent the purchasers a news release, dated October 11, 1984, that indicated that the conference center would be built during the summer of 1986. Most of the purchasers completed their 10% downpayments in November and December of 1984. Plaintiff Magnuson apparently did not make his downpayment (indeed, was not even solicited) until September of 1985.
 
 
 10
 On July 12, 1985, Stratton filed a post-effective amendment to the registration statement, incorporating a supplemental prospectus, with the SEC. The supplemental prospectus principally concerned the impact of certain changes in the tax laws on the investment. The supplemental prospectus also disclosed that Stratton did not plan to offer Phase II in the near future but would instead operate the Lodge as a 91 unit facility. The supplemental prospectus made no mention of the conference center.
 
 
 11
 Thirteen days after the filing of the supplemental prospectus, on July 25, 1985, Stratton and most of the purchasers closed the deal. The purchasers turned over the remaining 90% of the purchase price, in exchange for which Stratton transferred title to the condominium units. The record does not indicate precisely when Magnuson purchased his unit.
 
 
 12
 Plaintiffs allege that between the closing and June 13, 1987, Stratton concealed the fact that Stratton did not intend to construct the conference center. On that date, in a meeting with Phase I purchasers, Stratton announced that the conference center would not be built.
 
 
 13
 On June 1, 1988, three and one half years after the plaintiffs' cancellation rights terminated, plaintiffs filed suit in the District Court for the Southern District of New York, alleging a host of violations of state and federal law. The central thrust of the complaint was that Stratton had never intended to build the conference center, and that both the initial prospectus and subsequent representations by Stratton concealed that fact.
 
 
 14
 On December 26, 1990, 754 F.Supp. 318, the district court dismissed the complaint, granting plaintiffs leave to replead only the § 10(b) and RICO claims. Plaintiffs declined the offer to replead, and on October 23, 1991 the district court dismissed with prejudice all of plaintiffs' federal causes of action and refused to exercise jurisdiction over plaintiffs' pendent state law claims. This appeal followed.
 
 Discussion
 
 15
 On appeal, plaintiffs have abandoned their § 10(b) and RICO claims. They challenge, however, the district court's dismissal, on statute of limitations grounds, of their § 11 and § 12(2) claims. In addition, plaintiffs assert that the district court erred in ruling that there is no private right of action under § 17(a). We will consider these claims in turn, putting aside for the moment plaintiff Magnuson's claims, which involve different factual issues.
 
 
 16
 1. § 12(2).
 
 
 17
 Section 12(2) of the '33 Act prohibits offering and selling securities by means of untrue statements or misleading omissions. Section 13 of the '33 Act imposes a special, two tiered statute of limitations onto § 12(2) claims. First, § 13 bars § 12(2) claims brought more than "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Even where this one year limit is satisfied, the plaintiff must also bring the action within "three years after the sale." Id. Section 2 of the '33 Act provides that "[t]he term 'sale' ... shall include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). The question here is whether the statute of limitations runs from the "contract of sale" or from the "disposition of [the] security."
 
 
 18
 The district court dismissed the § 12(2) claim, reasoning that the statute of limitations runs from the moment that the parties become contractually bound to the deal. The court concluded that this happened in November and December of 1984, when the purchasers lost the ability to withdraw from the deal. Since the plaintiffs did not file suit until June 1, 1988, more than three years later, the district court ruled that § 13 barred plaintiffs' § 12(2) claim.
 
 
 19
 Plaintiffs cannot seriously dispute the district court's factual determination that they were committed to the deal in November or December of 1984. According to the prospectus, once plaintiffs made their full down payment of 10% of the purchase price, they became liable for that down payment plus "such additional damages that StratCorp can establish in any action or suit." In short, at that point plaintiffs lost the ability to withdraw from the deal.
 
 
 20
 Instead, plaintiffs assert that the proper moment to trigger the running of the statute of limitations is the moment when the plaintiffs actually paid the 90% balance of the purchase price and received the security on July 25, 1985. Plaintiffs rely principally on Raiford v. BusLease, Inc., 825 F.2d 351 (11th Cir.1987).
 
 
 21
 Raiford involved a claim under § 12(1) of the '33 Act based on an asserted failure to file a registration statement. The plaintiff brought suit more than one year after the contract of sale but less than one year after the transfer of funds pursuant to the sale. The Eleventh Circuit found plaintiffs' claim timely. The court reasoned that Congress structured the '33 Act to create an ongoing incentive to register securities. Id. at 354. Requiring plaintiffs to file suit within a year from the contract of sale would truncate that incentive and thus violate Congressional intent. Id. Accordingly, the court determined that the one year period ran from the transfer of funds and allowed plaintiffs' claim to go forward. Plaintiffs here argue on the strength of Raiford that the statute of limitations began to run from the closing on July 25, 1985, rather than from the moment the contract of sale became binding.
 
 
 22
 However, Raiford is readily distinguishable. First, Raiford considered the one year prong of the statute of limitations, which, in § 12(1) cases, runs from the "violation," not the date of "sale." Thus, Raiford gave an expansive meaning to a different word than is at issue here. More importantly, unlike in the § 12(1) context, construing the statute of limitations broadly on a § 12(2) claim would undermine Congressional purpose.
 
 
 23
 On plaintiffs' theory, if a buyer contracted to buy a security, with payments due every six months for twenty years, with title to pass at the end of the twenty year period, the buyer could use § 12(2) to sue the seller for fraudulent statements made ten years after the contract. Such open ended liability would frustrate the repose provided by § 13. While this may be appropriate in § 12(1) cases where the law imposes a continuing obligation, there is no need for such an extension of the statute of limitations in § 12(2) cases. Accordingly, we think that the district court correctly determined that a sale occurs for § 12(2) purposes when "the parties obligate[ ] themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." Amoroso v. Southwestern Drilling Multi-Rig Partnership, No. 1, 646 F.Supp. 141, 143 (N.D.Cal.1986) (quoting Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir.1972)). We affirm the district court's conclusion that plaintiffs' § 12(2) claims are time barred.
 
 
 24
 2. § 11.
 
 
 25
 Section 11 of the '33 Act creates civil liability for false and misleading statements made in registration statements. Plaintiffs assert that the June 21, 1984 prospectus misrepresented the likelihood that Stratton would build the conference center, and that the July 12, 1985 post-effective amendment to the prospectus compounded the fraud. The district court concluded that this claim was time barred. The court explained that the two tiered § 13 statute of limitations applies to § 11 claims, with the three year limit running from the date the security was "bona fide offered to the public."
 
 
 26
 Plaintiffs concede that, ordinarily, a security is "bona fide offered to the public" at the effective date of the registration statement, here June 21, 1984. See Morse v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 619, 622-24 (S.D.N.Y.1977). Plaintiffs contend, however, that in this case the bona fide offering date is July 12, 1985, when Stratton filed a post-effective amendment to the registration statement.
 
 
 27
 As authority for this proposition, plaintiffs point to SEC regulation S-K Item 512(a)(2), 17 C.F.R. § 229.512(a)(2). That regulation provides that:
 
 
 28
 for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.
 
 
 29
 Plaintiffs contend that this regulation compels the conclusion that the statute of limitations runs from the July 12, 1985 post-effective amendment, rather than the June 21, 1984 registration.
 
 
 30
 Plaintiffs simply misread the regulation. The regulation applies to securities registered "for the shelf", pursuant to Rule 415 under the Securities Act, 17 C.F.R. 230.415. In a "shelf registration", the registrant can register a large number of securities and offer the securities to the public "on a continuous or delayed basis." Id.; Delayed or Continuous Offering and Sale of Securities, 46 Fed.Reg. 42,001, 42,003 (1981). In order to insure accurate information for purchasers whenever shelf-registered securities are sold, the SEC requires issuers of shelf-offerings to amend the prospectus "to reflect ... any facts or events arising after the effective date of the registration statement ... which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement." 17 C.F.R. § 229.512(a)(1)(ii). Without § 229.512(a)(2), this ongoing reporting requirement would be meaningless, since purchasers who acquired securities in a shelf offering more than three years after the initial registration would find their § 11 claims barred by the time limits of § 13, even if they bought the securities in reliance on a fraudulent, post-effective amendment to the registration. To remedy this problem, § 229.512(a)(2), operating in the context of securities offered pursuant to the post-effective registration, deems the offering date to be the post-effective registration date, not the initial registration date. See Rule 415 under the Securities Act, 17 C.F.R. 230.415; Guenther v. Cooper Life Sciences, Inc., 759 F.Supp. 1437 (N.D.Cal.1990). Section § 229.512(a)(2) has no relevance to claims concerning securities offered pursuant to the initial registration statement.
 
 
 31
 Stratton did not offer any securities in connection with the July 12, 1985 post-effective amendment to the registration statement. Instead, that amendment announced that Stratton would not offer the Phase II units. Thus, § 229.512(a)(2) does not apply. The statute of limitations must instead be measured from the date of the initial registration statement, June 21, 1984. Measured from this date, plaintiffs' § 11 claim is time barred.
 
 
 32
 3. § 17(a).
 
 
 33
 Section 17(a) of the '33 Act forbids, among other things, engaging in fraudulent schemes and courses of conduct and making material untrue statements and omissions in the offer and sale of securities. Plaintiffs assert that Stratton's representations about the plan to build the conference center violated § 17(a). The district court rejected this claim on the ground that there is no private right of action under § 17(a).
 
 
 34
 In 1978, we held in Kirshner v. United States, 603 F.2d 234, 241 (2d Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979) that private individuals may sue for damages under § 17(a). We premised that decision on the similarity between the causes of action under § 17(a) and rule 10b-5. Since rule 10b-5, which reaches purchasers as well as sellers, unquestionably does create a private right of action, we concluded there would be little point in denying one under § 17(a). Kirshner, 603 F.2d at 241; see also SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (2d Cir.1968) (Friendly, J., concurring), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).
 
 
 35
 Ordinarily, Kirshner would dispose of the matter, since one panel of this court may not overrule the decision of a prior panel. However, that rule does not apply where an intervening Supreme Court decision casts doubt on the prior ruling. See Kremer v. Chemical Constr. Corp., 623 F.2d 786, 788 (2d Cir.1980), aff'd, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); Boothe v. Hammock, 605 F.2d 661, 664 (2d Cir.1979). Our reasoning in Kirshner has been fatally undercut by the Supreme Court's decision in Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).
 
 
 36
 In Aaron, the Court held that, unlike an action under rule 10b-5, in an action by the SEC for injunctive relief under § 17(a)(2) or (a)(3), the SEC did not have to establish scienter. Thus, Aaron broke the link between rule 10b-5 and § 17(a) on which we premised our decision in Kirshner. Accordingly, we can no longer justify the private right of action under § 17(a) on the ground that rule 10b-5 provides the same cause of action anyway.
 
 
 37
 The impact of Aaron is redoubled by the fact that in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Court strongly indicated the inappropriateness of implying a private right of action under the securities laws without a requirement of scienter. The Court explained that the host of procedural regulations that Congress placed on the explicit negligence based private rights of action of the '33 and '34 acts "indicate that the judicially created private damages remedy under 10b-5--which has no comparable restrictions--cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing." Id. at 210, 96 S.Ct. at 1389. To do otherwise would be to "nullify the effectiveness of the carefully drawn procedural restrictions on these express actions." Id. Accordingly, the Court held that 10b-5 private plaintiffs must prove scienter.
 
 
 38
 In sum, Aaron makes it clear that scienter is not required in most actions under § 17(a). Ernst & Ernst dictates that we should not imply a private right of action under the securities laws without a scienter requirement. This leaves one of two possibilities. Either there is no private right of action under § 17(a) or Aaron's negligence standard applies only to actions by the SEC and not to private plaintiffs, for whom scienter is required.
 
 
 39
 Courts of Appeals construing § 17(a) after Aaron have uniformly concluded that there is no private right of action. See, e.g., Newcome v. Esrey, 862 F.2d 1099, 1107 (4th Cir.1988) (en banc); Landry v. All American Assurance Corp., 688 F.2d 381, 391 (5th Cir.1982); Schlifke v. Seafirst Corp., 866 F.2d 935, 943 (7th Cir.1989); Deviries v. Prudential-Bache Securities, Inc., 805 F.2d 326, 328 (8th Cir.1986); In re Washington Public Power Supply System Securities Litigation, 823 F.2d 1349, 1358 (9th Cir.1987) (en banc); Bath v. Bushkin, Gaims, Gaines and Jonas, 913 F.2d 817, 819-20 (10th Cir.1990); Currie v. Cayman Resources Corp., 835 F.2d 780, 784-85 (11th Cir.1988). Although this court has on three occasions expressed doubts as to the existence of a private right of action under § 17(a), we have not until now been squarely presented with this issue. See Wexner v. First Manhattan Co., 902 F.2d 169, 173-74 (2d Cir.1990); Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 559 n. 3 (2d Cir.1985); Zerman v. Ball, 735 F.2d 15, 23 (2d Cir.1984). Given that nothing in the language or history of the section suggests a different mental state requirement for private and SEC actions under § 17(a), the lack of any evidence of Congressional intent to create a private right of action, and the overwhelming trend in our sister circuits, we conclude that there is no private right of action under § 17(a).[1] Accordingly, we affirm the district court's dismissal of the plaintiffs' § 17(a) claim.
 
 
 40
 4. Magnuson.
 
 
 41
 We turn now to consider the unique factual situation of plaintiff Magnuson. Magnuson asserts that his claims are not time barred, since Stratton did not even solicit him until September of 1985, and the complaint was filed within three years of that date. Magnuson concedes that he still must establish that he can satisfy the one year prong of the § 13 statute of limitations and requests leave to replead in order to do so.
 
 
 42
 Stratton responds that since the case was brought as a purported class action, Magnuson's claim must rise or fall with the claims of the class as a whole. There are two problems with this argument. First, the district court never certified the case as a class action. Thus, there is no class to drag down Magnuson's claim. In any event, Magnuson brought suit both as a representative and in his personal capacity. The dismissal of the claims of the remainder of the class cannot extinguish claims brought in his personal capacity.
 
 
 43
 Stratton also points out that Magnuson failed to raise the question below. However, a careful examination of the complaint and supporting affidavits reveals that Magnuson has not waived this argument. Paragraph 31 of the complaint states that "[o]n or after June 21, 1984, defendants ... delivered to each plaintiff ... a Prospectus." (emphasis added). Thus, the complaint is consistent with Magnuson's assertion that he received the prospectus well after June 21, 1984. Moreover, Stratton's own affidavit in support of its motion below to dismiss avers that Magnuson did not commit to the deal until September 24, 1985. Thus Stratton cannot be heard to assert now that Magnuson is foreclosed from arguing that the statute of limitations on his § 12(2) claim should run from September of 1985, rather than November or December of 1984. Accordingly, we grant plaintiff Magnuson leave to replead his § 12(2) claim in order to attempt to conform to the one year prong of the § 13 statute of limitations. If Magnuson is able to satisfy the one year prong, the district court should also reconsider whether to exercise pendent jurisdiction over Magnuson's state law claims.
 
 Conclusion
 
 44
 For the reasons stated above, we affirm the decision of the district court except with respect to plaintiff Magnuson. We grant Magnuson leave to replead his § 12(2) claim. Affirmed in part, reversed and remanded in part.
 
 
 
 [1]
 This opinion has been circulated to all the active and senior judges of this Court prior to its filing