**SUNNYSIDE COGENERATION ASSOCIATES and Environmental Power Corp.**

v.

**CENTRAL VERMONT PUBLIC SERVICE CORP., CV Energy Resources, Inc., and Appomattox Corp. (formerly Sunnyside Vermont Corp.)**

Civ. No. 92–CV–91.

United States District Court, D. Vermont.

Jan. 22, 1996.

Steven J. Kantor, Burlington, VT, for plaintiffs.

John J. Zawistoski, Rutland, VT, for defendants.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

(papers 39, 40, and 51)

MURTHA, Chief Judge.

The plaintiffs in this diversity action claim the defendants breached a contract to provide bridge financing for development of their waste coal cogeneration facility in Utah. As discussed *infra*, neither plaintiffs nor defendants have met their burden of demonstrating the absence of genuine issues of material fact. Accordingly, the pending cross motions for summary judgment are DENIED.

### I. Background

Each party moving for summary judgment has an initial burden of informing the Court of the basis for its motion and of identifying those parts of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Latimer v. Smithkline and French Laboratories*, 919 F.2d 301, 303 (5th Cir.1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts which show there is a genuine, material issue for trial. *See King Service, Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 295 (2d Cir.1987). Accordingly, for an opposing party to resist entry of summary judgment, it must come forward with enough evidence to support a verdict in its favor. It cannot defeat a properly supported motion merely by presenting metaphysical doubt, conjecture or surmise concerning the facts. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Borthwick v. First Georgetown Securities, Inc.*, 892 F.2d 178, 181 (2d Cir.1989). Only disputes over facts which might affect the outcome of the suit under the governing law preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Upon review of the submissions of the parties, and for the purpose of considering the pending motions, the Court finds the following facts. *See* Local Rule 5(c). Environmental Power Corporation (hereinafter "EPC") develops facilities which generate electricity from alternative energy sources, such as hydropower and waste coal. Through its subsidiary, Sunnyside Cogeneration Associates, EPC planned to build a waste coal cogeneration facility in Utah (hereinafter the "Sunnyside Project").

By April 1, 1991, EPC had obtained construction financing for the Sunnyside Project by issuing $109.5 million of tax exempt bonds. The commenced construction was to be completed in June 1993. In addition, EPC had secured all necessary power sales agreements, construction contracts and permits.

Also in 1991, EPC needed to raise cash to exercise an option to repurchase its position in a power project located in Scrubgrass, Pennsylvania (hereinafter the "Scrubgrass Project"). EPC's option expired in December 1991.

On July 29, 1991, EPC's agent, Kendall Capital Partners, L.P. (hereinafter "Kendall") issued a Preliminary Limited Offering Memorandum (hereinafter the "Offering Memo") to selected potential investors. The Offering Memorandum described EPC as

a publicly owned Delaware corporation engaged in the acquisition, development, construction, and operation of new and existing facilities generating electricity from

alternative energy sources including hydropower and waste-coal. EPC recently sold its 80 MW waste-coal fired cogeneration Facility in Scrubgrass, Pennsylvania, after completing the construction financing, to a group consisting of subsidiaries of Bechtel Enterprises and Pacific Gas & Electric Enterprises. EPC currently has an option to acquire the lessee entity of the Scrubgrass project prior to December 31, 1991 for a predetermined option price.

Offering Memo (attached to paper 39 as Exhibit 1) at 8.

The stated purpose of the offering was to obtain "(i) a bridge loan of $4 million to Sunnyside Power Corporation ("SPC"), a direct wholly owned subsidiary of EPC . . . and (ii) lease equity funding upon the successful completion of the performance tests." *See* Offering Memo at 1. Specifically, "[t]he proceeds of the bridge loan are intended to retire EPC's development loan to SPC and the bridge loan is to be repaid at [sic] the lease equity funding." Offering Memo at 1. Moreover, "[s]ubject to certain conditions specified in the Participation Agreement, the obligation of the Owner Participant to make its investment in the Project on the Funding Date will be absolute and unconditional." Offering Memo at 25.

By separate letters dated September 4 and September 17, 1991, Central Vermont Public Service Corporation, and its wholly-owned subsidiary, CV Energy Resources, Inc. (collectively referred to as "CVPS") proposed to EPC to purchase a 25% interest in the Sunnyside Project. *See* Letters (appended to paper 39 as Exhibits 2 and 3). In relevant part, the proposals state:

> CV Energy Resources, Inc. ("CVER") has evaluated the Confidential Investment Memorandum (the "Memorandum") dated July 29, 1991 regarding the sale by Sunnyside Cogeneration Associates ("SCA") of its equity interest in the Sunnyside Project (the "Project") and the arrangement of bridge financing. Based on the Memorandum and our own due diligence, CVER is willing to make a commitment for the lease equity transaction subject to certain modification and clarification of the terms and conditions of the offering.

CVER's offer to purchase is based on the lease transaction providing an after-tax yield to CVER of 18 percent. CVER wishes to have Kendall Capital Partners, L.P. modify the pro formas included in the Memorandum based on this yield. This offer is, therefore, contingent upon our review of the modified pro forma and the due diligence review proposed below.

CVER is currently working with Southern Electric International ("SEI") in anticipation of a joint-proposal for a 50–percent interest in the equity lease based on an after tax yield of 18 percent. SEI also desires to negotiate the Operations and Maintenance Agreement for the Project. Should SEI not participate in the offering, CVER is willing to continue with a joint proposal through other potential investors for the 50–percent interest.

Notwithstanding the proposal for the joint offering with a 50–percent interest in the equity lease, CVER is willing to propose an offer of $5,022,000 or 25–percent equity position providing an 18–percent after-tax yield to CVER.

As part of this offer, CVER is willing to assume construction risk and, further, assumes funding will be required on or about April 1, 1993. Our initial review of the offering has identified three issues requiring further review and acceptance.

.    .    .    .    .

> CVER's proposal is condition upon completion of the due diligence review, including the approval by CVER's independent auditors and tax counsel with respect to anticipated tax benefits, and upon approval by CVER's Board of Directors. CVER would expect to be able to proceed with the due diligence review immediately after your acceptance of our offer and be able to close on the purchase within thirty (30) days after the approval of our Board of Directors. . . .

*See* Paper 39 at Exhibit 2.

On September 27, 1991, representatives of CVPS, EPC and SEI met in Boston to discuss this proposal. When EPC rejected its offer to enter an operations and maintenance agreement, SEI left the meeting. However,

CVPS still wished to participate in the Sunnyside Project.

EPC's Chairman, Joseph Cresci, explained that EPC required cash to exercise its option to repurchase its share in the Scrubgrass Project, and that the option would expire in December 1991. He further explained that EPC needed a "bankable" commitment from CVPS; that is, a commitment which EPC could present to a bank as collateral for another loan. Thus, according to Cresci, "CVPS understood EPC's requirement for a bankable commitment and that CVP would make an investment in Sunnyside which was an absolute and unconditional commitment or, in any event, one which was acceptable to a bank for the purpose of providing immediate funds to EPC." Affidavit of Joseph E. Cresci (attached to paper 51 as Exhibit A) at para. 14.

CVPS' follow-up Letter dated September 30, 1991 does not substantiate Mr. Cresci's recollection of the September 27th meeting. In his follow-up correspondence, CV Energy Resources Senior Vice President states:

C.V. Energy Resources, Inc. appreciates the opportunity to meet with you last Friday and reach agreement on the acceptance of our offer for equity participation in the Sunnyside project as offered to you in our letter of September 17, 1991.

We understand your acceptance of our offer is not conditional on the participation of other investors as offered in our letter. We will proceed with our due diligence review with the expectation of reviewing the offering with the C.V. Energy Resources, Inc. Board of Directors at their regularly scheduled meeting on November 4, 1991.

See Letter (appended to paper 39 as Exhibit 4).

On October 2, 1991, the parties again met in Rutland to discuss the transaction. The plaintiffs claim, at this meeting, the parties reached agreement on the fundamental aspects of the transaction, including the price of $5.22 million for a 25% equity interest, the 18% after tax return, and the fact that CVPS' commitment to fund would be unconditional so EPC could obtain funds based on that commitment prior to the end of the year.

See Deposition of David McIlhenny (attached to paper 51 as Exhibit K) at 96, 102, 121. Again, Mr. Cresci claims to have discussed with CVPS representatives its need for a bankable commitment which could be used to raise the $4 million needed for EPC to exercise its option in the Scrubgrass Project. See Cresci Affidavit at 4.

The defendants' meeting minutes do not reflect such a discussion. See Minutes of October 2, 1991 Sunnyside Meeting (attached to paper 39 as Exhibit 6). However, an October 18, 1991 memorandum distributed by Kendall Capital Partners to individuals including representatives from CVPS purports to set forth "the accounting treatment (in non-accounting terms) and anticipated cash flow structure which will permit Central Vermont Energy Resources ('CVER') to account for its equity investment as a leveraged lease investment and will allow EPC to borrow $4.2 million from Fleet Bank secured by CVER's equity commitment." See Memorandum (attached to paper 51 as Exhibit 8) at 2. Moreover, subsequent drafts of the parties' Participation Agreement contain reference to a section titled "Owner Participant's Commitment Bankable," thereby supporting the inference that the defendants knew or should have known that plaintiffs were looking for some type of "bankable" commitment. See Draft Participation Agreements dated as of December 1, 1991 (attached to paper 39 as Exhibits 7 and 9) at para. 7.1.8.

By late October, it became clear the simple "unconditional loan" language proposed for inclusion in the aforementioned drafts of the Participation Agreement was insufficient to enable EPC to secure the loan needed to exercise its option on the Scrubgrass Project. To satisfy potential lenders that CVPS's commitment was unconditional and bankable, EPC's attorneys proposed inserting the following language into the October 29, 1991 draft of the Participation Agreement:

2.2 Unconditional Obligation to Fund. The obligations of Owner Participant under subsection 2.1(b)(i) and (ii) hereunder are absolutely unconditional and irrevocable, without notice, demand, counterclaim,

setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and in no way shall be released, discharged or otherwise affected for any reason, including without limitation: (a) any failure of the Project to be constructed or completed; (b) any defect or failure in the operation, condition, quality or fitness for use of the Project or any part thereof; (c) any damage to, removal, abandonment, salvage, loss, scrapping or destruction of or any requisition or taking of the Project or any part thereof; (d) any defect in title to the Site or the Project; (e) any change, waiver, extension, indulgence or other action or omission in respect of any obligation or liability of Lessee or Owner Participant; (f) any restriction, prevention or curtailment of or interference with any use of the Project, the Site or any part thereof; (g) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Lessee, Indenture Trustee, Owner Participant, Guarantor, Issuer or any other Person, or any action taken with respect to this Participation Agreement by any trustee or receiver of any Person mentioned above, or by any court; (h) any claim that Owner Participant has or might have against any Person under any Operative Document; (i) any failure on the part of Lessee or any other Person to perform or comply with any of the terms of any of the Operative Documents; (j) any invalidity or unenforceability or disaffirmance of this Participant Agreement or any provision hereof or of any other Operation Document or any provision of any thereof; (k) the breach, default or failure of any warranty or representation made in any Operative Document; (l) any other occurrence whatsoever, whether similar or dissimilar to the foregoing.

Draft Participation Agreement dated as of December 1, 1991 (attached to paper 39 as Exhibit 10) at 4–5.

CVPS claims presentation of this draft language constitutes the first time EPC clearly explained its equity commitment had to encompass more than an assumption of "construction risks" and had to be absolute even in the event of a total failure of consideration. For example, CVPS interpreted the new language as requiring it to spend over $5 million even if the Sunnyside Project was never constructed. Accordingly, CVPS found the new language unacceptable and exchanged other proposals in which it attempted to limit its risk to those it considered "construction risks," such as cost overruns, delays in completion, failure of the plant to achieve design output. *See* Affidavit of Joseph Kraus (attached to paper 39 as Exhibit 13) at para. 9.

When approached, Fleet Bank rejected the substitute language proposed by CVPS as evidencing a conditional commitment and refused the EPC loan. EPC and CVPS terminated their negotiations, thereby leaving EPC with no time to raise the money necessary to exercise its option from another bank. EPC alleges that CVPS' actions left it unable to exercise fully the Scrubgrass Project option, resulting in a loss of over $5 million.

## II.  Discussion

### A.

■ In its First Motion for Summary Judgment (paper 39), the defendants argue that the Plaintiff is equitably estopped from bringing this action because its July 29, 1991 Preliminary Limited Offering Statement did not disclose all material facts as required by Section 17(a) of the 1933 Securities Act, 15 U.S.C. § 77q(a)(2). Section 17(a) forbids the making of untrue statements and omissions in the offer and sale of securities. However, this section does not create a private right of action. *See, e.g., Finkel v. Stratton Corp.,* 962 F.2d 169, 175 (2d Cir.1992).

■ The defendants also claim the plaintiffs violated § 12(a)(2) of the 1993 Securities Act, 15 U.S.C. § 77l(a)(2). *See generally* Defendants' Memorandum in Opposition (paper 52). Section 12(a)(2) prohibits any person from offering or selling certain securities "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact...." As discussed *infra,* the precise nature of the representations made in con-

junction with the instant transaction is subject to interpretation, let alone whether those representations or omissions were materially misleading or untrue. *See Delta Holdings, Inc. v. National Distillers and Chemical Corp.*, 945 F.2d 1226, 1242 (2d Cir.1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992) (Omitted information is "material" if there is a substantial likelihood that the disclosure would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available.") Therefore, even assuming § 12(a)(2) applies to the transaction at issue, Defendants' First Motion for Summary Judgment must be denied.

### B.

Defendants' Second Motion for Summary Judgment and Plaintiffs' Cross Motion for Summary Judgment address a variety of theories arguably arising from plaintiffs' one count complaint in which they set forth CVPS' refusal to consummate the preliminary agreement to provide a bridge loan. Courts have recognized two types of preliminary agreements: (1) where the parties have reached complete agreement but have not yet formalized the contract; and, (2) where the parties have committed themselves to some major terms, with other terms remaining to be negotiated. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (citing with approval *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y. 1987)).

Under Vermont law, for a preliminary agreement to be enforceable, it must contain all material and essential terms to be incorporated in the subsequent contract. *See Reynolds v. Sullivan*, 136 Vt. 1, 383 A.2d 609, 611 (1978). The parties' correspondence and conduct suggest the existence of an enforceable preliminary agreement in that they addressed material and essential terms relating to the loan, such as the amount of the loan, interest and other conditions. In effect, the parties each accepted a mutual commitment to negotiate in good faith in an effort to finalize the transaction, thereby binding themselves to a preliminary agreement of the second type. *See Teachers Insurance*, 670 F.Supp. at 498.

However, as Judge Leval explained in *Teachers Insurance*, this obligation to negotiate the open terms

> does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

*Id.*

Judge Leval's explication succinctly sets forth the nature of the disputed issues in the instant case. On one hand, EPC claims that CVPS knew its obligation to fund had to be unconditional, and therefore "bankable," and yet refused to negotiate that term in good faith. *See Judge Development Corp. v. Bank of New York*, 814 F.Supp. 384, 388 (D.Vt. 1993) ("A term in a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation.") On the other hand, CVPS alleges that EPC's lack of candor regarding its intent to use its loan commitment as the basis for exercising an option in the Scrubgrass Project interjected a new condition which did not conform to the preliminary agreement. Moreover, all parties claim the breakdown in negotiations was the result of a lack of good faith. The record contains evidence from which a reasonable jury could find on these material issues for either plaintiffs or defendants; therefore, summary judgment is inappropriate.

### Conclusion

All pending motions for summary judgment (papers 39, 40 and 51) are DENIED. The parties are hereby notified this case will be placed on the next trial calendar.

SO ORDERED.